**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **NOE TORRES AND CYNTHIA** | § | |
| **TORRES,** | § | |
|     **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 7:14-CV-421** |
| | § | |
| **STATE FARM LLOYDS, RICHARD** | § | |
| **FREYMANN, AND RICHARD LEE** | § | |
| **WALLIS,** | § | |
|     **Defendants.** | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER**
**AND MOTION TO COMPEL WRITTEN DISCOVERY**

TO THE HONORABLE MICAELA ALVAREZ:

    COME NOW, Noe Torres and Cynthia Torres ("Plaintiffs") and file this, *Plaintiffs'*
*Response to Defendants' Motion for Protective Order and Motion to Compel*, and respectfully
request the Court deny the *Motion for Protective Order Against Abusive Discovery and An*
*Onerous ESI Protocol and In Favor of Producing in Reasonably Usably Formats* ("Motion for
Protective Order") filed by Defendants State Farm Lloyds ("State Farm") and Richard Lee
Wallis ("Wallis") (collectively "Defendants") and compel Defendants to provide discoverable
documents and material that are responsive to Plaintiffs' proper request, including electronically
stored information. In support thereof, pursuant to the Federal Rules of Civil Procedure,
Plaintiffs would respectfully show this Honorable Court the following:

## I.    SUMMARY OF CASE & BACKGROUND

1.    This is an insurance claim dispute arising out of Plaintiffs' claim for hail storm and/or
windstorm damages to their real property located in Hidalgo County that were sustained on or

about March 29, 2012. Plaintiffs made a claim against their Texas Homeowners' Insurance Policy ("the Policy"), which was issued by State Farm. Unsatisfied with Defendants' handling of their claim, Plaintiffs filed suit asserting that Defendants State Farm, Richard Freymann, and Richard Lee Wallis failed to conduct a reasonable investigation of Plaintiffs' claim and wrongfully denied and underpaid Plaintiffs' claim for properly covered damages.[1]

2.      On November 5, 2014, Defendants filed their Motion for Protective Order.[2] Defendants generally contend that they are entitled to a protective order pursuant to Federal Rule of Civil Procedure 26 because:  (1) Plaintiffs' request for production go beyond breach of contract issues and are irrelevant, burdensome, and inefficient; and (2) State Farm is entitled to produce responsive electronically stored information ( "ESI") in "reasonably usable formats."

3.      Defendants' Motion for Protective Order should be denied for several reasons.  First, in their Motion, Defendants repeatedly mischaracterize this case as "a simple breach of contract case" when, in fact, Plaintiffs have asserted multiple extra-contractual claims and causes of action against Defendants.  Plaintiffs' request for production to Defendants are both relevant and narrowly tailored to the issues in this case, which include issues of bad faith, unfair settlement practices, non-prompt payment of claims, and fraud.  Second, Defendants fail to meet *their burden* to show that each of Plaintiffs' request for production complained of are irrelevant or burdensome under the applicable discovery rules.  Finally, Defendants fail to meet their burden to prove that the information Plaintiffs seek is not reasonably accessible because of undue burden or cost, and Plaintiffs have good cause to justify production of ESI in the requested native format

4.      As such, the Court should deny Defendants' Motion for Protection and enter an order compelling Defendants to produce responsive documents to Plaintiffs' Requests for Production

---

[1] *See* Dkt. #1-4, *Plaintiffs' Original Petition*.
[2] *See* Dkt. #17.

pursuant to Plaintiffs' ESI Production Protocol, as well as re-produce any previously produced discovery pursuant to Plaintiffs' ESI Production Protocol.

## II. ARGUMENT & AUTHORITIES

### A. STANDARDS GOVERNING PROTECTIVE ORDERS.

5. While district courts have the discretion to issue protective orders to protect a party from undue burden or expense when good cause exists to do so, the court's discretion is limited by the careful prescriptions of Federal Rule of Civil Procedure 26.[3] The Fifth Circuit has stated that "Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that '[t]he burden is upon the movant to show the necessity of its issuance, which contemplates a ***particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements***.'"[4] A party resisting discovery must show specifically how ***each*** request is irrelevant or how ***each*** request is overly broad, burdensome, and oppressive.[5] Furthermore, a party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request.[6]

6. Here, Defendants fail to meet their burden to make a "particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements" that there is good cause for the court to grant the motion for protective order. Defendants also fail to present the required affidavits and evidentiary proof demonstrating the time or expense involved in

---

[3] FED. R. CIV. P. 26(c)(1); *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996).

[4] *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett,* 571 F.2d 1323, 1326 n. 3 (5th Cir.1978)) (emphasis added).

[5] *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990) (citing *Josephs v. Harris Corp.*, 677 F.2d 985, 991–92 (3d Cir.1982)) (emphasis added).

[6] *See Enron Corp. Sav. Plan v. Hewitt Associates, L.L.C.*, 258 F.R.D. 149, 159 (S.D. Tex. 2009); *S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006); *Waddell & Reed Financial, Inc. v. Torchmark Corp.*, 222 F.R.D. 450, 454 (D. Kan. 2004); *U.S. ex rel. Fisher v. Network Software Associates*, 217 F.R.D. 240, 246 (D. D.C. 2003); *Klesch & Co. Ltd. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003); *Wagner v. Dryvit Sys., Inc.*, 208 F.R.D. 606, 610 (D. Neb. 2001); *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 513 (N.D. Iowa 2000).

responding to the complained of discovery.

7.     As more fully discussed below, Plaintiffs' Requests for Production to Defendants are relevant and proper, and Defendants have failed to meet their burden to show that they should be entitled to protection from this discovery.  Thus, Defendants' Motion for Protection must be denied.

**B.  DEFENDANTS HAVE NOT MET THEIR BURDEN TO SHOW THAT ISSUANCE OF A PROTECTIVE ORDER IS NECESSARY.**

8.     Defendants assert that Plaintiffs' Requests for Production Nos. 19-20, 12, 16, 13, 11, 9-10, and 18 are irrelevant to this case.

9.     As previously stated, Defendants, as the party resisting discovery, bear the burden to show specifically how *each* request is irrelevant or how *each* request is overly broad, burdensome, and oppressive,[7] and, here, Defendants clearly fail to meet their burden. Defendants fail to show how each of the requests for production complained of is irrelevant. Neither Defendants' Motion nor Defendants' discovery responses provide any specifics about the irrelevance of the requested information or the undue burden Defendants would allegedly endure.  Defendants merely assert blanket objections to each of these requests.  Accordingly, this Court should deny Defendants' Motion and order Defendants to produce responsive documents to Plaintiffs' Requests for Production Nos. 19-20, 12, 16, 13, 11, 9-10, and 18 for this reason alone.

10.     Defendants' Motion for Protection should further be denied because no good cause exists for issuance of a protective order pursuant to Rule 26 as Plaintiffs' requests for production in this case are relevant to the issues, claims and causes of action.  Further, Plaintiffs' requests are properly and narrowly tailored without being overly broad or unduly burdensome.

---

[7] *Quarles*, 894 F.2d at 1485 (5th Cir. 1990) (emphasis added).

11.     Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense.[8]  Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.[9]  The Supreme Court has explained the relevancy requirement as follows:

> The key phrase in this definition—"relevant to the subject matter involved in the pending action"—has been construed broadly to encompass ***any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.*** See *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S. Ct. 385, 388, 91 L. Ed. 451 (1947). Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. *Id.*, at 500–501, 67 S. Ct. at 388. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits.[10]

12.     Defendants' main contention is that Plaintiffs' discovery requests going to bad faith and handling of other claims are not relevant because "this is a simple breach of contract case." However, this is a gross mischaracterization of Plaintiffs' causes of action against Defendants.

13.     First, Plaintiffs pled causes of action not only for breach of contract, but also for violations of Chapter of 541 and 542 of the Texas Insurance Code, breach of the duty of good faith and fair dealing, fraud, and conspiracy to commit fraud.[11]  Second, Defendants offer no authority for their novel proposition that Plaintiffs are not entitled to discovery on their other causes of action until the question of whether there was a breach of contract is answered.  There is no authority for this argument because the Supreme Court has clearly recognized that any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is, or may be, in the case is relevant to the subject matter of the case for purposes of Rule

---

[8] FED. R. CIV. P. 26(b)(1).
[9] *Id.*
[10] *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (emphasis added).
[11] *See* Dkt. #1-4, *Plaintiffs' Original Petition.*

26(b).[12]  Discovery into Plaintiffs' extra-contractual claims will help define and clarify the issues in this case.

14.     Accordingly, Defendants' contentions that Plaintiffs are not entitled to any discovery on their extra-contractual claims are completely without merit, and, as more fully demonstrated below, each of Plaintiffs' Request for Production are proper and relevant to their causes of action in this case.  Defendants also fail to show how each of the requests for production complained of are overly broad, burdensome, or oppressive.  As previously stated, "the burden is upon [the party seeking the protective order] to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."[13]

15.     Defendants' attempts to highlight excerpts of case law favorable to their proposition is misguided, and ultimately skews the opinions of the Courts to which they cite. Defendants selectively quote the opinion in *Washington v. Texas Dep't of Criminal Justice* in support of their proposition that a court may at first permit the plaintiff to take only a focused deposition of the defendant before allowing any additional discovery.  Defendants leave out a critical part of the opinion, which states:

> As the Supreme Court explained in discussing discovery ***where there are claims of qualified immunity***, "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). Indeed, a "court may at first permit the plaintiff to take only a focused deposition of the defendant before allowing any additional discovery." *Id*. at 599 (citing *Martin v. D.C. Metro. Police Dep't*, 812 F.2d 1425, 1437 (D.C. Cir.1987) (opinion of R.B. Ginsburg, J.)).[14]

16.     In *Crawford-El v. Britton*, the Supreme Court only discusses discovery in the context of

---

[12] *Sanders*, 437 U.S. at 351.
[13] *Sanchez v. Property & Cas.,* No. H-09-1736, 2010 U.S. Dist. LEXIS 1006, 2010 WL 107606, at *3 (S.D. Tex. Jan. 7, 2010) (unpublished) (quoting *In re Terra Int'l,* 134 F.3d at 306 (5th Cir. 1998)).
[14] No. CIVA C-05-011, 2006 WL 1806158, at *1 (S.D. Tex. June 29, 2006).

qualified immunity and explains the need for such narrowly tailored discovery as follows:

> When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense. It must exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings. The district judge has two primary options prior to permitting any discovery at all.[15]

Clearly, citation to this line of cases concerning discovery when qualified immunity is at issue is inapplicable to this case. It is also clear from these cases that allowing a plaintiff to only take a focused deposition of the defendant before permitting further discovery is due to concerns regarding protecting the substance of the qualified immunity defense. As no valid qualified immunity defense exists here, *Washington* is clearly inapplicable.

**C. DEFENDANTS HAVE NOT MET THEIR BURDEN TO SHOW THAT RESPONSIVE ESI PROPERLY REQUESTED BY PLAINTIFFS IS NOT REASONABLY ACCESSIBLE BECAUSE OF UNDUE BURDEN OR COST.**

17.    Defendants' Motion for Protective Order misinterprets the relevant Federal Rules of Civil Procedure. Rule 34(b), which Defendants' rely on to support their arguments that Plaintiffs' ESI protocol is "onerous," specifically states that "**[i]f a request <u>does not</u> specify a form for producing electronically stored information**, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms."[16]

18.    Defendants completely ignore the first part of this Rule in their Motion and somehow draw the conclusion that a responding party is given the right to choose an appropriate form, even when it has failed to provide any evidence or affidavits demonstrating that production in the requested form would result in discovery that is overly broad, burdensome, or oppressive to Defendants.

---

[15] *Crawford-El*, 523 U.S. 574, 597-98 (1998).
[16] FED. R. CIV. P. 34 (b)(2)(e)(ii) (emphasis added).

19.     Furthermore, Defendants' Motion completely ignores Rule 26(b)(2)(B), which provides:

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. **On motion to compel discovery or for a protective order, the party from whom discovery is sought <u>must show</u> that the information is not reasonably accessible because of undue burden or cost**.[17]

20.     The advisory committee's notes to the 2006 amendment of Rule 26(b)(2) also confirms that Defendants here have the burden of proving inaccessibility: "[t]he responding party has the burden as to one aspect of the inquiry—whether the identified sources are not reasonably accessible in light of the burdens and costs required to search for, retrieve, and produce whatever responsive information may be found."

21.     Thus, contrary to Defendants' contentions in its Motion for Protection, the issue here is not whether the native production is a production format which is "ordinarily maintained" or "reasonably usable."   Rather, because Plaintiffs specified a form of production to which Defendants objected, under Rule 26(b)(2)(B) Defendants now have the burden to prove that producing ESI in native format is not readily accessible because of undue burden or cost.[18]

22.     The Fifth Circuit requires that a party resisting discovery must show *specifically* how a request is burdensome and oppressive.[19]   Furthermore, several federal district courts have held that a party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request.[20]

---

[17] FED. R. CIV. P. 26(b)(2)(B) (emphasis added).

[18] *See Semsroth v. City of Wichita*, 239 F.R.D. 630, 634 (D. Kan. 2006) (the burden of establishing that the information is not reasonably accessible because of undue burden or cost is on the party responding to the discovery request).

[19] *Quarles*, 894 F.2d at 1485 (emphasis added).

[20] *See Enron Corp. Sav. Plan v. Hewitt Associates, L.L.C.*, 258 F.R.D. 149, 159 (S.D. Tex. 2009); *S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006); *Waddell & Reed Financial, Inc. v. Torchmark Corp.*, 222 F.R.D. 450, 454 (D. Kan. 2004); *U.S. ex rel. Fisher v. Network Software Associates*, 217 F.R.D. 240, 246 (D. D.C. 2003); *Klesch & Co. Ltd. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003); *Wagner v. Dryvit Sys., Inc.*, 208 F.R.D. 606, 610 (D. Neb. 2001); *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 513 (N.D. Iowa 2000).

23.     Federal courts have discussed the issue of inaccessibility and have held that the burden of proving inaccessibility can only be carried with real evidence, ***not just argument***.[21]   One court emphasized that the test for sufficiency of the showing of inaccessibility is whether the responding party has shown "details sufficient to allow the requesting party to evaluate the costs and benefits of searching and producing the identified sources."[22]   Another court emphasized that the distinction between accessible and inaccessible formats corresponds closely to the expense of production.[23]

24.     Defendants have clearly not met their burden here.   In support of their Motion for Protective Order, Defendants attach an affidavit by Mr. Tim Husarik and a declaration by Mr. Timothy M. Opsitnick.   However, upon close review of both documents, neither one shows that native production of ESI is not readily accessible because of undue burden or cost.   First, the affidavit by Mr. Husarik merely describes State Farm's ECS system and contains conclusory statements about what State Farm would have to do to comply with Plaintiffs' requests.   It does not even mention how long it would take or how costly it would be for State Farm to produce the ESI in native format.   Thus, this affidavit does not meet the Fifth Circuit's specificity requirement and does not help Defendants meet their burden.

25.     Likewise, Mr. Opsitnick's declaration merely describes his qualifications, his understanding of State Farm's ECS system, and his opinion on both federal law and State Farm's proposed production format.   Mr. Opsitnick's declaration is very carefully worded and contains many artful phrases such as "greatly preferable," "extraordinary and burdensome undertaking,"

---

[21] *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 261 (D. Md. 2008) (emphasis added); *Auto Club Family Ins. Co. v. Ahner*, No. 05-5723, 2007 U.S. Dist. LEXIS 63809 (E.D. La. Aug. 29, 2007) (explaining that the subpoenaed nonparty, like the requested party, has the burden of proving inaccessibility by admissible evidence, not argument).

[22] *Mikron Indus., Inc. v. Hurd Windows & Doors, Inc.*, No. C07-532RSL, 2008 U.S. Dist. LEXIS 35166 (W.D. Wash. Apr. 21, 2008).

[23] *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003).

"unnecessary burden," and "significant burden." However, like Mr. Husarik's affidavit, Mr. Opsitnick's declaration contains no specifics of how much time or how much cost will go into producing the ESI in native format. Mr. Opsitnick repeatedly states that State Farm would be required to "develop and validate new processes and workflows" but does not even mention the associated time or cost it would take State Farm to do so. It could take State Farm one hour to create such processes and workflows, which both Mr. Husarik and Mr. Opsitnick could consider an "unnecessary burden" for purposes of this litigation.

26.     Mr. Opsitnick's declaration also contains several other statements and conclusions which offer no support for Defendants to meet their burden. For example, Mr. Opsitnick states that "this is a simple breach of contract case." As Plaintiffs have already shown, however, this is not a simple breach of contract case. Thus, this statement shows that Mr. Opsitnick is woefully unfamiliar with the central issues in this case and others involving State Farm Lloyds in federal district courts in Texas. Mr. Opsitnick also makes several statements regarding federal law, but cites to no authority other than the Sedona Conferences. While Plaintiffs do not dispute the integrity of the Sedona Conferences, Mr. Opsitnick's opinions regarding the same simply do not help Defendants meet their burden. Furthermore, this lack of authority clearly shows that these statements are merely his interpretation of federal law and not a statement of what federal law actually says.

27.     At most, the affidavit and declaration merely show what State Farm would allegedly have to do to produce documents in native format. Both are purely argumentative and do not offer any details to allow the requesting party to evaluate the costs and benefits of the requested ESI. Thus, they do not show how the requested ESI is not readily accessible because of undue burden or cost. Merely describing a process and then repeating it is burdensome is not being specific, it

is a generalization carefully crafted to seem burdensome at first glance without really giving any specifics of time and cost at all. Both Mr. Husarik and Mr. Opsitnick merely offer their opinions on what *they believe* is a better form of production. These conclusory and argumentative opinions simply cannot help Defendants meet their burden. Because Defendants have not met their burden as required by Rule 26(b)(2)(B), this Court must deny Defendants' Motion.

**D. DEFENDANTS SHOULD BE COMPELLED TO PRODUCE RESPONSIVE ESI IN NATIVE FORMAT AS GOOD CAUSE EXISTS FOR PERMITTING THIS DISCOVERY.**

28. Notwithstanding, the Court may nonetheless order discovery in the requested native format if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).[24] The comments to the 2006 amendments to Rule 26(b)(2) contain the following considerations for courts to use in their good cause determinations: (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of the further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources.

29. Comment to the 2006 amendments to Rule 26(f) also provides that "[i]nformation describing the history, tracking, or management of an electronic file (sometimes called "metadata") is usually not apparent to the reader viewing a hard copy or a screen image." Some examples of metadata include "a file's name, a file's location (e.g., directory structure or pathname), file format or file type, file size, file dates (e.g., creation date, date of last data modification, date of last data access, and date of last metadata modification), and file

---

[24] *See* FED. R. CIV. P. 26(b)(2)(B).

permissions (e.g., who can read the data, who can write to it, who can run it).”[25]  Most metadata is generally not visible when a document is converted to an image file.[26]  Metadata can be altered intentionally or inadvertently and can be extracted when native files are converted to image files.[27]

30.      In terms of importance, metadata can help in proving the authenticity of the content of electronic documents, as well as establish the context of the content.[28]  Metadata can also identify and exploit the structural relationships that exist between and within electronic documents, such as versions and drafts.[29]  One court noted the following in discussing the variations of metadata:

> It is important to note that metadata varies with different applications. As a general rule of thumb, the more interactive the application, the more important the metadata is to understanding the application's output. At one end of the spectrum is a word processing application where the metadata is usually not critical to understanding the substance of the document. The information can be conveyed without the need for the metadata. **At the other end of the spectrum is a database application where the database is a completely undifferentiated mass of tables of data. The metadata is the key to showing the relationships between the data; without such metadata, the tables of data would have little meaning.** A spreadsheet application lies somewhere in the middle. While metadata is not as crucial to understanding a spreadsheet as it is to a database application, a spreadsheet's metadata may be necessary to understand the spreadsheet because the cells containing formulas, which arguably are metadata themselves, often display a value rather than the formula itself. To understand the spreadsheet, the user must be able to ascertain the formula within the cell.[30]

31.      Plaintiffs' counsel has already fought this native production battle with State Farm in state court.  In a hearing on the issue of production of ESI in native format, both plaintiffs and

---

[25] *See Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 646 (D. Kan. 2005) (citing *The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age,* App. E (The Sedona Conference Working Group Series, Sept. 2005 Version)).
[26] *Id*.
[27] *Id*. (citing *The Sedona Conference Glossary*, p. 28-29).
[28] *Id*. (citing *The Sedona Guidelines*, App. E).
[29] *Id*.
[30] *Williams*, 230 F.R.D. at 647 (emphasis added).

State Farm presented testimony of ESI experts.[31]  State Farm's expert was Mr. Opsitnick and plaintiffs' expert was Mr. Craig Ball.[32]  Mr. Opsitnick agreed that Mr. Ball is an accomplished author and lawyer who has spent years of his professional career focusing on issues relating to the discovery of electronically stored information.[33]  During his testimony, Mr. Ball explained the importance of native production to plaintiffs' claims, how much relevant information plaintiffs would lose if State Farm was allowed to produce ESI in non-native format, and how production in static image format is actually much more expensive than producing ESI in native format.[34]

32.     Mr. Ball explained that State Farm essentially seeks a "downgraded form" of production.[35]  Production in image format makes the documents significantly less searchable.[36]  State Farm can search its database by fields of information.[37]  However, State Farm wants to take that fielding away and produce documents which are essentially print outs, not searchable by field, not sortable by field, and are much more expensive forms to use.[38]  For example, when you reduce an Excel spreadsheet to a TIFF image, even a TIFF image that has a searchable load file, Plaintiffs will not be able to see the formulas, the structure, or the relationship to data.[39]

33.     Mr. Ball also explained how color, for the sake of information, is important.[40]  Sometimes color is used to communicate information and, for example, if red text has a different meaning than blue text Plaintiffs will not know what that means unless produced in native

---

[31] *See* Reporter's Record in Cause No. C-3828-13-D; *Alejos Ramirez and Ofelia Ramirez v. State Farm Lloyds and Sylvia Garza*, In the District Court of Hidalgo County, Texas, 206th Judicial District, on July 8, 2014, attached hereto and incorporated herein as Plaintiffs' "Exhibit A."
[32] *Id*.
[33] *Id*. at 141:17-22.
[34] *Id*. at 188:8-219:7.
[35] *Id*. at 192:19-193:23.
[36] *Id*. at 195:1-2.
[37] *Id*. at 193:5-6.
[38] *Id*. at 193:9-23.
[39] *Id*. at 195:15-24.
[40] *Id*. at 197:5-6.

format.[41]  Furthermore, State Farm does not have to do anything to produce color documents in native form because the color is intrinsic in the document and it also costs State Farm less.[42]

34.    Mr. Ball also went on to explain what else Plaintiffs would lose if State Farm was allowed to produce ESI in static image format:

> A: So whether we talk about e-mail where we will lose the threading information that allows us to see the conversation and the timing information that allows us to construct the thread across a reliable timeline, or PowerPoints where we don't get animation, speaker notes, color, et cetera, Excels where we don't get any of the formulas that make the Excel what it is, word documents where they propose to excise all of the comment imbedded, tracked changes and much of the metadata and then, finally, the database content where they want to take all of the fielding away so that we can't actually search them with anything like the facility they depend on day-to-day, that's what they propose.[43]

35.    Mr. Ball also reviewed State Farm's affidavits in support of its production protocol for his testimony, but did not find one thing that would require extraordinary steps, significant cost, or would be a burden on State Farm.[44]  In contrast, the form State Farm requests is actually more expensive for Plaintiffs than it is for State Farm.[45]  State Farm takes a native file format that is intrinsically very small and then inflates it by anywhere from ten (10) to twenty (20) times larger by converting it to an image, making it much more expensive for Plaintiffs, than it is for State Farm, to process the same information.[46]  The process that State Farm is insisting they want is

---

[41] *Id*. at 197:1-10.
[42] *Id*. at 197:11-15.
[43] *Id*. at 198:6-19.
[44] *Id*. at 203:8-20.
[45] *Id*. at 195:3-5.
[46] *Id*. at 199:10-16.

what actually costs money.[47]  Furthermore, Plaintiffs' ESI Production Protocol actually requires fewer steps than State Farm' proposed form of production.[48]  For example, TIFF format is inherently unsearchable, so Plaintiffs will have to create a new means or mechanism in order to be able to search the document.[49]

36.    The most efficient form of ESI production is native format.[50]  Plaintiffs are merely asking for documents as they're kept and are not asking for State Farm to process the documents for Plaintiffs.[51]  State Farm could hand the discovery over to Plaintiffs as they pull it onto a thumb drive or external hard drive, which it has to do anyways.[52]  Plaintiffs are not imposing additional duties and are merely asking that State Farm not be allowed to downgrade the requested data for production.[53]  Mr. Ball even testified that anybody could see this on their own computer by taking, for example, an email and converting it into PDF or TIFF and seeing how the size of the file swells.[54]

37.    Good cause to order production of ESI in native format exists here because it is clear from the Sedona Conferences, federal case law, and the testimony of Mr. Ball that Plaintiffs would lose a significant amount of vital metadata if Defendants are allowed to produce documents only in static image format.  The requested metadata will allow Plaintiffs to actually process the ESI and understand it as Defendants use it, rather than just see what Defendants want them to see.  For example, Plaintiffs will be able to see the formulas used in spreadsheets and not just the number in the cell.  Plaintiffs will also be able to see any changes made to letters regarding their claim, training documents for adjusters, and who these changes were made by,

[47] *Id*. at 206:1-3.
[48] *Id*. at 202:5-12.
[49] *Id*. at 202:19-22.
[50] *Id*. at 201:8-9.
[51] *Id*. at 200:13-16.
[52] *Id*. at 200:16-19.
[53] *Id*. at 200:23-25.
[54] *Id*. at 201:9-15.

just to name a few. This information is crucial to Plaintiffs establishing a timeline of what exactly happened and when in the mishandling of their claim. Plaintiffs cannot obtain this information from any other source because it only exists in native form, i.e. the form that State Farm uses it in its ordinary course of business. Furthermore, Plaintiffs have shown that production in native format is actually less expensive and requires fewer steps than Defendants' proposed form of production. Therefore, there is good cause for this Court to order Defendants to produce ESI in native format pursuant to Plaintiffs' ESI Production Protocol, as well as re-produce any previously produced documents pursuant to Plaintiffs' ESI Production Protocol.

**E. DEFENDANTS SHOULD BE COMPELLED TO PRODUCE RESPONSIVE DOCUMENTS TO PLAINTIFFS' REQUEST FOR PRODUCTION.**

38.     Plaintiffs' discovery requests and the ESI Protocol at issue have previously been authorized and implemented by the 206th Judicial District Court of Hidalgo County, Texas as "Master Discovery" for cases in the Hidalgo hail MDLs, which like Plaintiffs' case are first-party insurance claim dispute cases arising out of the March 29, 2012 and/or April 20, 2012 hail storms in Hidalgo County. This Master Discovery contains reasonable, relevant, and appropriate requests that were drafted, developed, and tailored with the direct assistance and input of various plaintiffs' and defense counsel involved in the Hidalgo hail litigation, including counsel for State Farm. Likewise, the ESI Protocol was developed and tailored with the direct input of various plaintiffs' and defense counsel involved in the Hidalgo hail litigation, again including counsel for State Farm.

39.     Tremendous time and effort has already been spent by the 206th Judicial District Court of Hidalgo County and counsel on both sides to ensure that the propounded discovery requests at issue are proper, relevant, and narrowly tailored to seek information and documents that are important to the parties' claims and defenses in this case. State Farm's counsel was actively

involved, and State Farm's interests therefore adequately represented, in the development of this discovery and the ESI Protocol at the various conferences and hearings leading up to the implementation of same. Each request and provision were thoroughly reviewed, scrutinized and revised by plaintiffs' counsel and defense counsel alike and with the assistance of a duly-appointed special master for discovery.

### i. XactAnalysis Reports

40.     Plaintiffs' Request for Production No. 19 asks for "[a]ll XactAnalysis reports that include this claim in any way, this Policy, the amount paid on this Policy and/or referencing the person who handled the claim made the basis of this lawsuit relating to claims arising out of the Hidalgo County hail storms occurring on or about March 29, 2012 and/or April 20, 2012." Request for Production No. 20 asks for "any email or document that transmits, discusses, or analyzes any report produced in response to Request for Production No. 19 above."

41.     State Farm uses "XactAnalysis" to monitor and track its claim data. State Farm can actually compare the data contained in these reports to the claim data of other carriers in the industry. Through this system, management can generate reports on just about any claim related information, such as estimate trends for a particular storm, a particular adjuster, or for an entire region of the country for a period of time.

42.     The XactAnalysis system allows for a State Farm manager to track a particular claim handler's estimating trends such as average estimate amount, average percentage of depreciation applied, and percentage of total estimates that include overhead and profit, just to name a few. Plaintiffs believe that performance reviews and compensation incentives for adjusters like those who handled Plaintiffs' claim are directly related to the claim data contained within these reports. State Farm tracks the average paid per claim and the average amount paid per roof

damage per adjuster on a particular storm. Plaintiffs believe that management uses this information to monitor whether adjusters are following State Farm policy and procedure for a particular storm event. For example, if State Farm, through the XactAnalysis program, sees the adjuster is paying too much overhead and profit on their claims, that person will likely be taken off of the claims. If an adjuster is paying too much for roof damage on his claims, he will likely be disciplined and, if the problem persists, terminated.

43. The averages for a storm operation as a whole, like the Hidalgo County hail storms for example, can also be closely monitored by State Farm. Management can also compare the amount paid per claim by State Farm for a particular geographic region to that of other carriers on similar claims. Plaintiffs believe that State Farm uses this information in these reports to determine what policy and procedure directives to implement for a particular storm event. For example, if the reports show that adjusters in a particular area, such as South Texas, are paying more for roof damage per estimate than in other parts of Texas, the management in South Texas will be given strict instructions to bring these numbers down. Management in South Texas will then instruct the claims handlers to change the way they are adjusting roof claims in a way that will lower the total estimate value. The change could be something small, maybe only affecting each claim by a hundred dollars. However, when this change is applied to tens of thousands of claims, the dollars being saved by State Farm can be huge.

### ii. State Farm's Organizational Charts

44. Plaintiffs' Request for Production No. 12 asks for "[a]ll organizational charts, diagrams, lists, and/or documents reflecting each department, division or section, of Defendant's company to which the claim made the basis of this lawsuit was assigned." Multiple adjusters, claims representatives, trainers, and managers should have been involved with Plaintiffs' claim in one

way or another. The independent adjuster and State Farm's own claim representatives that handles portions of Plaintiffs' claim were each assigned to a particular State Farm supervisor referred to as a "Team Manager." The Team Manager is responsible for overseeing the handling of the claims on his team. One of the important roles of the Team Manager is to ensure that the adjusters on his team are properly trained to handle the losses. Additional training will be recommended by the Team Manager for any adjuster who is not meeting expectations.

45. State Farm maintains "Master Personnel Rosters" during catastrophes for the individual catastrophe offices. The roster contains the hierarchy for the individuals at that office, including the names of all adjusters assigned to a particular Team Manager. One issue that Plaintiffs believe contributed to the mishandling of their claim was improper oversight of the files by management. One reason it was impossible for the Team Managers to properly supervise what was taking place on these files is that there were simply too many adjusters being assigned to each Team Manager. This information will be contained within the personnel rosters and is vital in determining the management issue in this case.

46. In addition, Plaintiffs contend that the adjusters assigned to their claim were inexperienced in handling of these types of claims. This inexperience caused errors and mistakes that may have been avoided had the claim been assigned to more experienced adjusters. The rosters for the Hidalgo County hail operation will show not only who was responsible for supervising these adjusters but also whether there were trainers available to the adjusters who handled Plaintiffs' claim.

### iii. Reserves on Plaintiffs' Claim

47. Plaintiffs' Request for Production No. 16 asks for all documents reflecting the pre-anticipation of litigation reserve(s) set on the claim made the basis of this lawsuit, including any

changes to the reserve(s) along with any supporting documentation. Before State Farm adjusted Plaintiffs' claim, State Farm set a reserve of the maximum amount State Farm would pay Plaintiffs' on their claim. Information regarding the amount of this reserve is relevant to Defendants' mishandling of Plaintiffs claim. For example, State Farm could have initially valued the claim at a high amount, but then only paid Plaintiffs a fraction of that initial value. This would be evidence of Defendants' bad faith insurance practices, as well as the mishandling of Plaintiffs' claim.

### iv.   Texas Insurance Adjuster Licenses and License Applications

48.    Plaintiffs' Request for Production No. 13 asks for all Texas insurance licenses and/or certifications in effect at the time of the claims arising out of the Hidalgo County hail storms for all persons who worked on Plaintiffs' claim, including any document relating to the application, issuance, or review of those licenses and/or certifications.

49.    Plaintiffs have alleged that the State Farm and its adjusters failed to conduct a reasonable investigation of Plaintiffs' claim. Therefore, the insurance licenses and applications of the State Farm employees who worked on Plaintiffs' claim are relevant to whether State Farm and its adjusters' investigation was reasonable or not. Plaintiffs also believe that the adjusters assigned to Plaintiffs' claim were improperly trained, so any adjusters' license, certification, or lack thereof is essential to Plaintiffs' claims. Furthermore, Defendants cannot say that this request is overbroad as this request only applies to persons who handled Plaintiffs' claim made the basis of this lawsuit.

### v.   Personnel Files

50.    Plaintiffs' Request for Production No. 11 seeks production of personnel files of persons, managers and/or supervisors who directly handled Plaintiffs' claim made the basis of this lawsuit

and is limited to the past five (5) years.  First, federal courts have found personnel files of claims handlers to be discoverable in cases alleging the bad faith handling of an insurance claim.[55] Regardless, Plaintiffs are seeking the personnel files in order to obtain information related to the individual claim representatives' training and experience, such as whether the claim representative has ever been reprimanded for his work and what, if any, training the claim representative was recommended to complete by management and if such training was completed.  Plaintiffs are alleging that State Farm performed an unreasonable investigation of Plaintiffs' claim.  The particular training the adjusters and/or supervisors involved in the handling of Plaintiffs' claim have taken, or for that matter, have not taken are extremely relevant to whether State Farm performed an unreasonable investigation of Plaintiffs' claim.

51.     In addition, it is anticipated that the files will contain the claims representative's annual or semi-annual job performance reviews along with the criteria used to measure his job performance.  At the end of each year, the claim representatives involved in the handling of Plaintiffs' claim have a face-to-face meeting with their supervisor to discuss their job performance for that year.  Those who have met certain company expectations can receive a salary increase for the following year.  Plaintiffs believe these salary increases are based upon meeting arbitrary claim payment goals set by State Farm.  The salaries and bonuses paid to claim representatives therefore are directly related to how much the representative paid out on claims or, stated differently, how much they saved State Farm in underpaying claims.  Company policies such as not including prospective general contractor's overhead and profit, for example, are instituted to reduce the total payout on claims. Evidence of employees following, or not following, such policies and any related effects on bonus and/or salaries will be contained within

---

[55] *AKH Co. v. Universal Underwriters Ins. Co.*, 300 F.R.D. 684, 692 (D. Kan. 2014); *Waters v. Continental General Ins. Co.,* No. 07–282–TCK–FHM, 2008 WL 2510039, at *1 (N.D. Okla. June 18, 2008).

the personnel files. As such, personnel files are highly relevant to Plaintiffs' causes of action.

### vi. Pricelists

52.     Plaintiffs' Request for Production Nos. 9-10 request a copy of all price lists used to prepare any estimates for Plaintiffs' claim made the basis of this lawsuit, as well as all documents related to the creation or alteration of the price.

53.     Plaintiffs are entitled to discover the mechanisms used by State Farm in determining what value was placed on Plaintiffs' claim, how such values were calculated, and the reasons for the valuation and/or denial of Plaintiffs' claim.  Such information is necessary in order to judge the adequacy of any payments and/or settlement offers product in Plaintiffs' case and the true value of Plaintiffs' claim in light of insurance industry standards.  It is Plaintiffs' belief that State Farm intentional undervalues the prices used on estimates for damages in the State of Texas.  One of the most expensive trades on claims is the roofing trade.  State Farm, Plaintiffs believe, goes to great lengths to save money by undervaluing roof damages.  There are people at State Farm whose only job is to survey local roofers in particular locations.  These employees also field complaints and inquiries from contractors, roofers, and other individuals in their zone regarding the sufficiency of the roofing prices State Farm is using on claims.

54.     The items requested by Plaintiffs in their Request for Production Nos. 9-10 will show that State Farm is fully aware of the undervaluing of roof damages on claims like Plaintiffs' claim. Furthermore, since Plaintiffs and State Farm are not competitors in the insurance industry, any objection that the information contained in such production is confidential, proprietary and constitutes a trade secret is invalid and frivolous.   Any other objections are further made frivolous because State Farm has routinely produced these price lists before in other litigation. The information contained in these requests is essential to the litigation of the case at bar.

### vii. Work Performance and Claims Patterns

55.    Plaintiffs' Request for Production No. 18 asks for all documents relating to work performance, claims patterns, claims problems, commendations, claims trends, claims recognitions, and/or concerns for any person who handled the claim made the basis of this lawsuit.

56.    To evaluate the performance of its claims handling department, as well as the individual claim representatives handling catastrophe losses during a particular event, State Farm conducts a significant amount of internal audits and claim surveys.  State Farm uses these various surveys to ensure that claims are being handled in line with State Farm policies and procedures.  Trends discovered in the survey results are reported to corporate headquarters.  State Farm also monitors whether the adjusters and claim representatives are complying with the statutes and laws of the particular state that governs insurance claims.

57.    These surveys, in addition to periodic reports sent to management during the catastrophe, allow State Farm to keep track of every detail of the claim operation.  The results of these surveys will frequently result in revisions to training protocols.  Plaintiffs' causes of action relate to State Farm's handling of their claim in bad faith and in violation of the Texas Insurance Code.  Whether or not State Farm's claims handling procedures and standard met industry standards, as portrayed in part through data reflected in audits and surveys, can help prove State Farm's bad faith.

### III.    CONCLUSION

58.    This is not a simple breach of contract case.  Plaintiffs pled specific causes of action against Defendants including violations of the Texas Insurance Code, fraud, and breach of the duty of good faith and fair dealing.  Discovery regarding Defendants' mishandling of Plaintiffs'

claim is, thus, clearly relevant to these causes of action. Defendants have also failed to meet their burden to show how Plaintiffs' Requests for Production are irrelevant and burdensome. Regardless, Plaintiffs' Requests for Production are both relevant and narrowly tailored to the issues in this case. Defendants also completely mischaracterize Federal law regarding production of ESI and have not met their burden of proving how production in native format is not reasonably accessible because of undue burden or cost. Notwithstanding, there is good cause for this Court to order production of ESI in native format because metadata is vital to Plaintiffs' causes of action, production in native format requires less steps, and is actually less expensive than production in static image format. Accordingly, this Court should deny Defendants' Motion for Protective Order and compel Defendants to produce responsive documents to Plaintiffs' Requests for Production pursuant to Plaintiffs' ESI Production Protocol, as well as re-produce any previously produced documents pursuant to Plaintiffs' ESI Production Protocol.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray this Honorable Court deny *Defendants' Motion for Protective Order Against Abusive Discovery and an Onerous ESI Protocol and in Favor of Producing in Reasonably Usable Formats* and order Defendants to produce responsive documents to Plaintiffs' Requests for Production pursuant to Plaintiffs' ESI Production Protocol, as well as re-produce any previously produced documents pursuant to Plaintiffs' ESI Production Protocol. Plaintiffs also request any other and further relief, either at law or in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

**THE MOSTYN LAW FIRM**


*/s/ J. Steve Mostyn*
J. Steve Mostyn
State Bar No. 00798389
Federal Bar No. 21550
jsmdocketefile@mostynlaw.com
3810 West Alabama Street
Houston, Texas 77027
(713) 861-6616 (Office)
(713) 861-8084 (Facsimile)

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to all counsel of record on this 25th day of November, 2014 pursuant to the Federal Rules of Civil Procedure:


*/s/ J. Steve Mostyn*
J. Steve Mostyn


## CERTIFICATE OF CONFERENCE

I hereby certify that Plaintiffs' counsel attempted to confer with defense counsel about the issues raised in *Plaintiffs' Motion to Compel.* However, counsel for Defendants has yet to provide a position on the motion to compel. Therefore, the motion to compel is being filed as opposed.

*/s/ J. Steve Mostyn*
J. Steve Mostyn