UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| NOE TORRES, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 7:14-CV-421 |
| | § | |
| STATE FARM LLOYDS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

Pending before the Court is the "Motion for Protective Order"[1] filed by Defendants. Plaintiffs responded to Defendants' motion and incorporated a "Motion to Compel Written Discovery" in the response.[2] Defendants then filed a reply to the motion for protective order[3] and Plaintiffs filed a sur-reply.[4] Defendants also filed a separate response to Plaintiffs' motion to compel.[5] After considering the motions, responsive filings, record, and relevant authorities, the Court **GRANTS** Defendants' motion for protective order, and **DENIES** Plaintiffs' motion to compel, with one exception.

### I. Background

Plaintiffs' claims arise from the 2012 wind and hail storms that struck the Rio Grande Valley, causing damage to their property. On April 15, 2014 Plaintiffs filed a lawsuit in state court alleging several insurance-related causes of action.[6] The case was removed by Defendants

---

[1] Dkt. No. 17 ("Motion for Protective Order").
[2] Dkt. No. 20 ("Response and Motion to Compel").
[3] Dkt. No. 24 ("Reply").
[4] Dkt. No. 25 ("Sur-reply").
[5] Dkt. No. 26 ("Response to Motion to Compel").
[6] Dkt. No. 1, Exhibit A at p. 6 ("Petition").

on June 4, 2014,[7] and on September 17, 2014 this Court entered an alternative scheduling order allowing time for the parties to engage in informal negotiations and setting the case for status conference on February 10, 2015.[8] The Court has not yet issued a Rule 26 Scheduling Oder in this case. Earlier in this case, the Court granted Plaintiffs' motion to withdraw their motion to remand and dismissed Defendant Richard Freymann as improperly joined.[9]

## II. The Instant Motions

### a. Defendants' Motion for Protective Order

Defendants object to Plaintiffs' requests for production numbers 9, 10, 11, 12, 13, 16, 18, 19, 20 because they are "unduly broad, seek irrelevant information, and go beyond the discrete question initially at issue; namely, whether State Farm underpaid Plaintiffs' insurance Claim."[10] Additionally, Defendants take issue with the form of production Plaintiffs seek regarding electronically stored information ("ESI").[11] In the motion, Defendants request a protective order limiting the scope of discovery and allowing production of electronically stored information in a format not in accordance with Plaintiffs requested "ESI Protocol."[12] Defendants also request that discovery be sequenced to focus on the breach of contract issue first and then the extra-contractual claims subsequently if the breach of contract can be established.

### b. Plaintiffs' Motion to Compel

In the response to Defendants' motion for protection, Plaintiffs ask the Court to deny Defendants' motion and make a separate motion to the Court to compel Defendants to produce documents responsive to Plaintiffs' requests for production and in accordance with the ESI

---

[7] Dkt. No. 1.
[8] Dkt. No. 12.
[9] Dkt. No. 11.
[10] Motion for Protective Order at ¶ 3.
[11] *Id.* at ¶ 5.
[12] *Id.* at ¶ 6.

Production Protocol ("the Protocol"), including re-producing any previously produced material not in accordance with the Protocol.[13]

### III. Applicable Law

#### a. Protective Orders

Upon a motion by "a party or any person from whom discovery is sought," Federal Rule of Civil Procedure 26(c) permits a court, "for good cause, [to] issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . ." On a showing of good cause, the district court is allowed to use its discretion to restrict what can be obtained through discovery, how it can be obtained, and how parties can use the materials once they are obtained.[14] Though there is no clear standard for what constitutes "good cause;" the "burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."[15] In determining "good cause" the Court will also look to the impact of the request on the producing party compared to the value of production to the requesting party.

#### b. Scope of Discovery

Federal Rule of Civil Procedure 26(b) governs the permissible scope of discovery. The Rule's phrasing is deliberately broad,[16] providing that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." However, district courts are tasked with guarding

---

[13] Response and Motion to Compel at ¶ 4.
[14] *Harris v. Amoco Prod. Co.*, 768 F. 2d 669, 684 (5th Cir. 1985).
[15] *In re: Terra International, Inc.,* 134 F.3d 302, 306 (5th Cir. 1998) (citing *United States v. Garrett,* 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)).
[16] *Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 262 (5th Cir. 2011) ("Generally, the scope of discovery is broad . . .").

against abusive discovery, including "an unwieldy, burdensome, and speculative fishing expedition."[17] Ultimately, "[d]istrict courts have wide discretion in determining the scope and effect of discovery."[18] This power includes the ability to set the timing and sequence of discovery and tailoring the discovery process to focus narrowly on one issue before expanding the scope of discovery.[19]

Discovery rules "are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials,"[20] but courts must also firmly limit discovery to relevant material to avoid unnecessary expense. Rule 26(b)(2)(C) provides that the Court must limit the extent of discovery if the discovery sought is unreasonably cumulative or duplicative or can be obtained from a more convenient or less burdensome source; if the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or if the burden or expense of the proposed discovery outweighs its likely benefit "considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

c. *Requests for Production*

Rule 34 allows a party to request production of a document, electronically stored information, or other tangible items within the scope of Rule 26(b).[21] Requests must describe each item requested, specify how the item will be inspected, and may specify the form in which electronically stored information is to be produced.[22] For each item, the responding party "must

---

[17] *Id.* at 264.
[18] *Bradley v. Boysville, Inc.*, 240 F.3d 1073 (5th Cir. 2000).
[19] *See Crawford-El v. Britton*, 523 U.S. 574 (1998); Fed. R. Civ. P. 26(d).
[20] *Herbert v. Lando*, 441 U.S. 153, 177 (1979).
[21] Fed. R. Civ. P. 34(a)(2).
[22] Fed. R. Civ. P. 34(b).

either state that inspection and related activities will be permitted as requested or state an objection to the request, including the reasons."[23]

Rule 34(b)(2)(E) governs the production of electronically stored information like the highly disputed State Farm records at issue in this case. Plaintiffs put forward an extremely distorted and disingenuous reading of how Rule 34 outlines the production of electronically stored information, so the Court will carefully outline the correct interpretation of the Rule. Contrary to the confusing logic and selective presentation of Plaintiffs, the plain reading of Rule 34 is actually quite clear. Rule 34(b)(2)(E)(i) states that "[a] party must produce documents as they are kept in the usual course of business . . ."[24] Additionally, "[i]f a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms."[25] Thus, the Rules give preference to documents produced as they are ordinarily maintained absent a specific request from the other party.

However, contrary to Plaintiffs' representation, *it does not follow that if the requesting party specified a form for production, the information must be produced in that form*. If a requesting party specified a form for production, the responding party "may state an objection to a requested form for producing electronically stored information. If the responding party objects to a requested form . . . the party must state the form or forms it intends to use."[26] The Court will then rule on the objection and determine how the information should be produced. The 2006 Committee Notes provide further elucidation:

> If the requesting party is not satisfied with the form stated by the responding party, or if the responding party has objected to the form specified by the

---

[23] Fed. R. Civ. P. 34(b)(2)(B).
[24] Emphasis added.
[25] Fed. R. Civ. P. 34(b)(2)(E)(ii).
[26] Fed. R. Civ. P. 34(b)(2)(D).

> requesting party, the parties must meet and confer under Rule 37(a)(2)(B) in an effort to resolve the matter before the requesting party can file a motion to compel. **If they cannot agree and the court resolves the dispute, the court is not limited to the forms initially chosen by the requesting party [or] stated by the responding party** . . .[27]

According to both the Rules and the Committee Notes, the prevailing requirement is that the electronically stored information be provided in a "reasonably usable" form. However, this does not mean that "a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in litigation."[28] Whether the producing party should be *required* to convert the information from the way it is ordinarily maintained to a "more usable form" should be addressed under Rule 26(b)(2)(B).[29]

Rule 26(b)(2)(B) states that "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." The producing party must "show" that an undue burden or cost would be required to produce the information,[30] though the Rules are silent as to what constitutes an adequate "showing." Even if the producing party meets this burden, the Court can order discovery from the disputed sources "if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)."[31] In order to show good cause, the requesting party must show that "the need for discovery outweighs the burdens and costs of locating, retrieving, and producing the information."[32] Even if a requesting party is able to demonstrate good cause to overcome a showing of undue burden or cost by the responding party, the Court may deny the

---

[27] Committee Notes on Rules – 2006 Amendment to Rule 34.
[28] *Id.*
[29] *Id.*
[30] Fed. R. Civ. P. 26(b)(2)(B).
[31] *Id.*
[32] Committee Notes on Rules – 2006 Amendment to Rule 26.

request if "the discovery sought . . . can be obtained from some other source that is more convenient, less burdensome, or less expensive."[33] Thus, Rule 34 is both broadened by the scope of discovery allowed under Rule 26 and also limited by the burdens and costs of producing the discovery under Rule 26. Ultimately, the Court must engage in a balancing assessment of the likely value of the information to Plaintiffs compared to the burden production imposes on Defendants.

## IV. Plaintiffs' Complaint

In order to properly evaluate the scope of discovery and the importance of Plaintiffs' requested information, the Court must consider the causes of action alleged in the complaint. The Court notes that Defendant Richard Freymann has been dismissed from this case, so the claims based on his actions and the causes of action against him are no longer relevant. The bulk of Plaintiffs' complaint focuses on the undervaluing of the loss and Defendants failure to pay an appropriate amount based on Plaintiffs' claim. The causes of action against only State Farm include: breach of contract, unfair settlement practices, noncompliance with the Texas Insurance Code for prompt payment of claims, and breach of the duty of good faith and fair dealing.[34] Against Defendant Wallis, Plaintiffs claim that he "was improperly trained and failed to perform a thorough investigation of Plaintiffs' claim,"[35] leading him to state that Plaintiffs' damages were less severe than they actually were, use this "lack of severity" as a basis for denying properly covered damages, and fail to provide an adequate explanation for the inadequate compensation Plaintiffs received.[36] Plaintiffs claim all of these actions constitute deceptive insurance practices.

---

[33] Fed. R. Civ. P. 26(b)(2)(C)(i).
[34] Complaint at ¶¶ 55-72.
[35] *Id.* at ¶ 18.
[36] *Id.* at ¶ 35-44.

Plaintiffs also allege causes of action for fraud against all Defendants based on the intentional undervaluing of covered storm damage[37] and knowing that Plaintiffs would be unable to sufficiently repair their covered hail storm and/or windstorm damages based on an estimate that was created using State Farm's prices.[38] Plaintiffs also allege conspiracy to commit fraud because Defendants "were members of a combination of two or more persons whose object was to accomplish an unlawful purpose or a lawful purpose by unlawful means."[39]

Accordingly, the scope of discovery will be limited to information relevant to these claims or reasonably calculated to lead to admissible evidence regarding these claims. Requests for information not sufficiently related to breach of contract, unfair settlement practices, noncompliance with the Texas Insurance Code for prompt payment of claims, breach of the duty of good faith and fair dealing, deceptive insurance practices, fraud, or conspiracy to commit fraud are considered outside the scope of discovery. While all of the causes of action arise from Plaintiffs' insurance claim, it is not true, as Defendants contest, that the discrete question initially at issue is confined to "what was owed under Plaintiffs' insurance policy and what was paid by State Farm."[40] While the extra-contractual claims do stem from the breach of contract claim, discovery is permitted as to all of the claims simultaneously.

## V. Defendants' Motion for Protective Order

Defendants' request for protective order ultimately has two separate issues: objections to specific requests for production and an objection to the requested format for production of ESI. In ruling on these issues, the Court will consider the relevancy of Plaintiff's requested

---

[37] *Id.* at ¶ 53.
[38] *Id.* at ¶ 52.
[39] *Id.* at ¶ 54.
[40] Motion for Protective Order at ¶ 4.

information, the impact of the request on Defendants, and whether Defendants have demonstrated "good cause" for the protective order.

*a. Specific Requests for Production*

Defendants request that the Court strike Plaintiffs' Request for Production to State Farm numbers 9, 10, 11, 12, 13, 16, 18, 19, and 20.[41] However, Plaintiffs contend that the objections are insufficient because Defendants offer "blanket objections" instead of specifying how each request is irrelevant, overly broad, or burdensome.[42] The Fifth Circuit has held that the "party resisting discovery 'must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive.'"[43] Plaintiffs are correct that a level of specificity is required instead of a conclusory allegation. Ultimately, Defendants object to each of the nine requests by stating Plaintiffs "issue written discovery requests that go way beyond the facts of this claim, instead seeking documents related to other claims and wholly irrelevant information about State Farm, generally."[44] It is possible that multiple requests can be overly broad or irrelevant for the same reason. In this case, it is because Defendants believe these requests go beyond the facts of this case by seeking information related to third-party claims and the operations of State Farm. The objection does not go to the burden, but goes to the scope, and is certainly more specific than stating simply that the request is "irrelevant" or "overly broad." Thus, the Court will evaluate each request individually in light of Defendants' objection.

However, to Plaintiffs' certain chagrin, this also means that the Court will consider whether the requests constitute a "fishing expedition" outside the scope of discovery. In *Mauldin v. Fiesta Mart*, the plaintiff had offered no evidence or proof of discrimination beyond "his own

---

[41] *Id.* at ¶ 37.
[42] Response and Motion to Compel at ¶ 9.
[43] *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)(citing *Josephs v. Harris Corp.*, 677 F.2d 985, 991-92 (3d Cir. 1982)).
[44] Motion for Protective Order at ¶ 12.

subjective beliefs."[45] To support this belief, the plaintiff requested detailed employment information with respect to all managerial personnel in every Fiesta Mart grocery store for a ten-year period of time in hopes of revealing a "company-wide preference for Hispanic managers."[46] The Fifth Circuit found that this was a "'fishing expedition' calculated to uncover something upon which to rest the otherwise unsupported allegations in his complaint."[47] Similarly, the Court notes that many of the requests for production are based on Plaintiffs' *belief* that State Farm is conspiring to undervalue claims across the Rio Grande Valley arising out of the 2012 hail storms. Plaintiffs claim that many of their requests are *not* merely speculative because "Plaintiffs' counsel has sat through hundreds of depositions involving State Farm adjusters and corporate personnel and has gained some knowledge with regards to how State Farm operates."[48] Since this knowledge alone cannot help Plaintiffs prove their claims, they seek further proof in the form of discovery to substantiate this knowledge.[49] This "further proof" sought to substantiate Plaintiffs' counsel's suspicions is exactly the type of "fishing expedition" prohibited by *Fiesta Mart*. Plaintiffs are not permitted to abuse the discovery process to hunt for evidence of a conspiracy theory that goes well beyond the claims at issue in this case.

Additionally, Plaintiffs' requests for reports or information regarding unrelated third parties are not within the scope of this case. In a strikingly similar case decided by the Texas Supreme Court, the plaintiff sought to compare the insurance company's evaluation of her claim against other claims to support her contention that her claims were undervalued.[50] The Texas Supreme Court held:

---

[45] 114 F.3d 1184, 1997 WL 255640, at *2 (5th Cir. 1997) (unpublished).
[46] *Id.*
[47] *Id.*
[48] Sur-reply at ¶ 8.
[49] *Id.*
[50] *In re National Lloyds Insurance Company*, 2014 WL 5785871, at *2 (Tex. Oct. 31, 2014).

> [W]e fail to see how [the insurance company's] overpayment, underpayment, or proper payment of the claims of unrelated third parties is probative of its conduct with respect to [the plaintiff's] undervaluation claims at issue in this case . . . This is especially so given the many variables associated with a particular claim, such as when the claim was filed, the condition of the property at the time of filing (including the presence of any preexisting damage), and the type and extent of damage inflicted by the covered event. Scouring claim files in hopes of finding similarly situated claimants whose claims were evaluated differently from [the plaintiff's] is at best an "impermissible fishing expedition."[51]

The Court finds this position accurately addresses several of Plaintiffs' requests for production. The Court will not allow Plaintiffs to fish into unrelated third-party matters because that information cannot reasonably support whether *Plaintiffs'* claims were undervalued. Even if Plaintiffs were able to establish an ostensible pattern or practice of undervaluation of claims in the Rio Grande Valley, it would not prove that this individual claim was undervalued.

The Court now turns to each disputed request for production to evaluate whether the requested information is properly within the scope of discovery, taking into consideration any permissible factors weighing against production.

      i.     <u>Number 9: Produce a copy of all price lists used to prepare any estimates for the claim made the basis of this Lawsuit. To the extent the pricelist is an unmodified pricelist from a third party, you can reference the vendor and version of the pricelist with a stipulation that it is unmodified.[52]</u>

Plaintiffs seek the price lists to better understand how State Farm determined "what value was placed on the claim, how such values were calculated, and the reasons for valuation and/or denial of Plaintiffs' claim."[53] Plaintiffs contend this will allow them to evaluate any payments or settlement offers against the true value of Plaintiffs' claim in light of insurance industry standards.[54] Additionally, Plaintiffs note:

---

[51] *Id.* (citation omitted).
[52] Motion for Protective Order, Exhibit A at p. 15.
[53] Response and Motion to Compel at ¶ 53.
[54] *Id.*

It is [their] **belief** that State Farm intentional [sic] undervalues the prices used on estimates for damages in the State of Texas. One of the most expensive trades on claims is the roofing trade. State Farm, Plaintiffs **believe**, goes to great lengths to save money by undervaluing roof damages.[55]

Plaintiffs intend to show that State Farm is fully aware of the undervaluing of roof damages on claims like Plaintiffs'.[56] Defendants argue that Plaintiffs "offer nothing more than a theory and a hope, neither of which are sufficient to force State Farm to undertake the burden and expense of producing responsive documents."[57]

The Court finds that while Plaintiffs may seek value placed on the claim, how it was calculated and reasons for valuation and denial, they have failed to show that the price lists will reveal that information. Rather, the estimates provided to Plaintiffs, either during State Farm's handling of the claim or in accordance with the Court's alternative scheduling order,[58] and how those estimates were determined, are insufficient alone for Plaintiffs to adequately determine whether the claim was undervalued. To the extent that a price list is relied upon as a basis for the calculations, those price lists are relevant for this purpose. The Court finds this request within the proper scope of discovery and relevant to the issues in this case. Accordingly, the objection is **OVERRULED.**

      ii.    <u>Number 10: To the extend Defendant created or altered any prices used in the preparation of an estimate in the claim made the basis of this Lawsuit, produce all documents related to the creation or alteration of the price, including the original price for that item and the factual bases for the creation or alteration.[59]</u>

Plaintiffs do not provide any novel or compelling justification for requesting this information apart from their reasoning for requesting the price lists above. Requesting "created

---

[55] *Id.* (emphasis added).
[56] *Id.* at ¶ 54.
[57] Reply at ¶ 17.
[58] Dkt. No. 12.
[59] Motion for Protective Order, Exhibit A at p. 15.

or altered" price lists is the same as requesting price lists used to prepare the estimate. Therefore,

Defendants' objection to this request is **SUSTAINED.**

> iii. Number 11: A complete copy [of] the personnel file related to performance (excluding medical and retirement information) for all people and their managers and/or supervisors who directly handled the claim made the basis of this Lawsuit, including all documents relating to applications for employment, former and current resumes, last known address, job title, job descriptions, reviews, evaluations, and all drafts or versions of requested documents. This request is limited to the past 5 years.[60]

Since Plaintiffs allege State Farm performed an unreasonable and bad faith investigation of Plaintiffs' claim, they request the personnel files "in order to obtain information related to the individual claim representatives' training and experience, such as whether the claim representative has ever been reprimanded for his work and what, if any, training the claim representative was recommended to complete by management and if such training was completed."[61] Additionally, Plaintiffs are interested in viewing the claim representative's job performance review and the criteria used to evaluate performance because

> [t]hose who have met certain company expectations can receive a salary increase for the following year. Plaintiffs **believe** these salary increases are based upon meeting arbitrary claim payment goals set by State Farm. The salaries and bonuses paid to claim representatives therefore are directly related to how much the representative paid out on claims or, stated differently, how much they saved State Farm in underpaying claims. Company policies such as not including prospective general contractor's overhead and profit, for example, are instituted to reduce the total payout on claims. Evidence of employees following, or not following, such policies and any related effects on bonus and/or salaries will be contained within the personnel files.[62]

Defendants argue that this is a fishing expedition to prove Plaintiffs' groundless theories.[63] The Court agrees. What Plaintiffs are truly seeking is evidence of a perverse incentive

---

[60] Motion for Protective Order, Exhibit A at p. 15.
[61] Response and Motion to Compel at ¶ 50.
[62] *Id.* at ¶ 51 (emphasis added).
[63] Reply at ¶ 17.

structure that encourages State Farm employees to deliberately undervalue claims, which they hope will be contained in the personnel file. However, the ostensibly appropriate grounds for this request – that Defendant Wallis was improperly trained and failed to perform a satisfactory evaluation – does not support the overly broad nature of the request. It is unclear to the Court how all documents *including drafts* relating to employment applications, former and current resumes, last known addresses, and job titles *for Defendant and his superiors for the past five years* shed light on Defendant's alleged failures that Plaintiffs contend underpin deceptive insurance practices. Therefore, Defendants' objection is **SUSTAINED.**

    iv.    <u>Number 12: All organizational charts, diagrams, lists, an[d]/or documents reflecting each department, division or section of Defendant's company to which the claim made the basis of this Lawsuit was assigned.</u>[64]

Plaintiffs seek this information because a multitude of individuals, including adjusters, claims representatives, trainers, and managers, should have been involved with Plaintiffs' claims in one way or another.[65] Plaintiffs believe that, after the catastrophe, claims were mishandled because there was improper oversight by management since too many adjusters were assigned to each supervisor.[66] Plaintiffs are seeking the rosters in order to determine the management issues that may have contributed to mishandling the claims[67] and also whether trainers were available to the adjusters who handled Plaintiffs' claims.[68]

Defendants argue that this request is inappropriate because Plaintiffs do not link the lack of oversight and experience to the actual handling of the claim.[69] They protest that "Plaintiffs' wild guesses as to a series of events that may have led to State Farm's employees' alleged

---

[64] Motion for Protective Order, Exhibit A at p. 16.
[65] Response and Motion to Compel at ¶ 44.
[66] *Id.* at ¶ 45.
[67] *Id.*
[68] *Id.* at ¶ 46.
[69] Reply at ¶ 13.

mishandling of their claims is not a suitable reason to require State Farm to undergo the burdensome and costly process of producing documents responsive to [the request]."[70]

The Court agrees with Defendants that the links in Plaintiffs' causal chain are far too attenuated to be relevant to the claim at hand. What might have happened among the management does not account for the alleged mishandling of the claim *in this case.* Even if there was improper oversight and even if trainers were not available to adjusters, the findings would not be dispositive as to whether this individual claim was improperly handled. Accordingly, the objection is **SUSTAINED.**

> v.  <u>Number 13: All Texas insurance licenses and/or certifications in effect that [sic] the time of the claims arising out of the Hidalgo County hail storms which occurred on or about march 29, 2012 and/or April 20, 2012 for all persons who worked on the claim made the basis of this Lawsuit, including any document relating to the application, issuance or review of those licenses and/or certifications.[71]</u>

Plaintiffs contend that "the insurance licenses and applications of the State Farm employees who worked on Plaintiffs' claim are relevant to whether State Farm and its adjusters' investigation was reasonable or not."[72] Since Plaintiffs also believe that the assigned adjusters were improperly trained, the adjusters' license, certification, or lack thereof is essential to that claim.[73] Defendants object in the reply that Plaintiffs are purely speculating and there is no concrete information or reason to believe State Farm's adjusters were improperly trained or unlicensed.[74] The Court finds that it is relevant to the case whether instrumental individuals retained the necessary licenses at the time of the claim. However, the request for licenses and certifications *for all persons who worked on the claim* is vague and inappropriately broad. It is

---

[70] *Id.*
[71] Motion for Protective Order, Exhibit A at p. 16.
[72] Response and Motion to Compel at ¶ 49.
[73] *Id.*
[74] Reply at ¶ 15.

unclear whether this request pertains just to the investigators who worked on this claim or to the myriad of managers and supervisors Plaintiffs allege were involved in this claim in some capacity. Therefore, the objection is **SUSTAINED.**

      vi.     <u>Number 16: All documents reflecting the pre-anticipation of litigation reserve(s) set on the claim made the basis of this lawsuit, including any changes to the reserve(s) along with any supporting documentation.</u>[75]

Plaintiffs assert that information regarding that amount State Farm set as the maximum amount they would pay on Plaintiffs' claim is relevant to allegations that Defendants' mishandled the claim because paying Plaintiffs only a fraction of this initial value could be evidence of Defendants' bad faith insurance practices.[76] Defendants argue this request is not relevant because there is no evidentiary basis underpinning this theory or reason to believe further investigation will produce evidentiary support.[77]

While paying Plaintiffs only a fraction of the initial value could be evidence of bad faith, it could also be evidence of something totally unrelated. Plaintiffs do not, and in fact cannot, assert a causal connection between State Farm paying less than the maximum amount set aside and State Farm acting in bad faith. In fact, the Court can conjecture many scenarios where paying a fraction of the initial value *would not be* evidence of Defendant's bad faith insurance practices to counter Plaintiffs' conjecture to the contrary. Therefore, discovery of this information is not actually related to the claims at issue and Defendants' objection is **SUSTAINED.**

      vii.     <u>Number 18: All documents relating to work performance, claims patterns, claims problems, commendations, claims trends, claims recognitions, and/or concerns for any person who handled the claim made the basis of this Lawsuit.</u>[78]

---

[75] Motion for Protective Order, Exhibit A at p. 16.
[76] Response and Motion to Compel at ¶ 47.
[77] Reply at ¶ 14.
[78] Motion for Protective Order, Exhibit A at p. 17.

To evaluate the performance of the claims handling department, Plaintiffs present that State Farm conducts internal audits and claim surveys to ensure claims are being handled in accordance with company policies and procedures.[79] These reports also apprise State Farm of every detail of the claims operation, resulting in revisions to training protocols.[80] Plaintiffs argue that, since the causes of action relate to Defendants' bad faith and mishandling of their claim, "[w]hether or not State Farm's claims handling procedures and standard met industry standards, as portrayed in part through data reflected in audits and surveys, can help prove State Farm's bad faith."[81] Defendants argue that Plaintiffs do not have a genuine basis for seeking this information apart from base theories and speculation leading to a fishing expedition.[82]

The Court finds that this is exactly the kind of inquiry prohibited by *In re National Lloyds.* Claims trends, patterns, and common concerns *not solely related to the claim at hand* are outside the scope of discovery because they cannot speak to what happened in this individual case. Defendants' alleged bad faith and mishandling of this claim is not proven by their procedures, industry standards, audits, or surveys but by individualized actions particular to this case. Accordingly, Defendants' objection is **SUSTAINED.**

      viii.    <u>Number 19: All XactAnalysis reports that include this claim in any way, this Policy, the amount paid on this Policy and/or referencing any person who handled the claim made the basis of this Lawsuit relating to claims arising out of the Hidalgo County hail storms occurring on or about March 29, 2012 and/or April 20, 2012.[83]</u>

Plaintiffs are requesting this information because they "believe that performance reviews and compensation incentives for adjusters like those who handled Plaintiffs' claim are directly

---

[79] Response and Motion to Compel at ¶ 56.
[80] *Id.* at ¶ 57.
[81] *Id.*
[82] Reply at ¶ 16.
[83] Motion for Protective Order, Exhibit A at p. 17.

related to the claim data contained within these reports."[84] Plaintiffs also believe that, by tracking the average paid per claim and the average amount paid per roof, State Farm management uses the information to monitor adjusters and ensure they are not paying too much overhead and profit on their claims.[85] Additionally, Plaintiffs pontificate that:

> State Farm uses this information in these reports to determine what policy and procedure directives to implement for a particular storm event. For example, if the reports show that adjusters in a particular area, such as South Texas, are paying more for roof damage per estimate than in other parts of Texas, the management in South Texas will be given strict instructions to bring these numbers down. Management in South Texas will then instruct the claims handlers to change the way they are adjusting roof claims in a way that will lower the total estimate value. The change could be something small, maybe only affecting each claim by a hundred dollars. However, when this change is applied to tens of thousands of claims, the dollars being saved by State Farm can be huge.[86]

Defendants assert that these reports are wholly unrelated to the insurance claim at issue.[87] The Court agrees. Plaintiffs do not even present a veiled reason for seeking this information but instead put forth their theory that State Farm is conspiring to undervalue claims all across South Texas through strong-arm tactics and perverse incentives. Plaintiffs are concerned about the impact on "tens of thousands of claims" by State Farm supposedly requiring adjusters to undervalue roof claims. This request is a prime example of a fishing expedition. Instead of seeking information cabined to the instant claim, Plaintiffs unabashedly seek information laying the groundwork for claims far outside the scope of this case. The discovery process cannot be abused for this purpose. Defendants' objection is **SUSTAINED.**

---

[84] Response and Motion to Compel at ¶ 42.
[85] *Id.*
[86] *Id.* at ¶ 43.
[87] Reply at ¶ 12.

      ix.      <u>Number 20: Any email or document that transmits, discusses, or analyzes any report produced in response to Request for Production No. 19 above.</u>[88]

Since Plaintiffs' request for emails and documents is intricately related to the previous request, the objection is also **SUSTAINED.**

    *b.  Production of Electronically Stored Information*

      i.      <u>The Parties' Positions</u>

As a separate issue from the disputed requests for production, Plaintiffs request that all electronically stored information be provided in its "native" format, meaning "in the form in which the information was customarily created, used and stored by the native application employed by the producing party in the ordinary course of business."[89] However, if that is infeasible, Plaintiffs permit:

> [The information] may be produced in an agreed-upon near-native form; that is, in a form in which the item can be imported into the native application without a material loss of content, structure or functionality as compared to the native form. Static image production formats serve as near-native alternatives only for information items that are natively static images (*i.e.*, photographs and scans of hard-copy documents).[90]

Plaintiffs insist that they need all of the information from Defendants produced in "native" or "near native" format in order to capture the metadata. Plaintiffs argue that Defendants' proposed method of production – searchable static images – will not allow them to search or sort the database by fields of information and they will not be able to see the formulas, structure, or relationship of the data normally captured in an Excel spreadsheet.[91] Producing information in the native format would also allow Plaintiffs to see color, in case color is used to

---

[88] Motion for Protective Order, Exhibit A at p. 17.
[89] Motion for Protective Order, Exhibit B at ¶ 2.
[90] *Id.* at ¶ 3.
[91] Response and Motion to Compel at ¶32.

communicate information.[92] Without the metadata, Plaintiffs complain that they will not be able to see the threading information in an email chain, speaker notes and animation on PowerPoint slides, or comments and tracked changes on Word documents.[93] They will also be able to view changes made to claim letters and who authored any edits.[94] Plaintiffs believe the metadata is vital to understanding the information as Defendants use it and in constructing a timeline of what exactly happened in the mishandling of their claim.[95]

Defendants would like to produce relevant emails and other documents, such as the insurance policy and claims handling documentation, in a single file in searchable static image format, not in the requested native or near-native format.[96] They propose that information from their databases be produced in "standard report formats that are routinely generated in the ordinary course of business."[97] The way State Farm maintains records of claims information is through its Enterprise Claims System ("ECS"), which creates, stores, manages, and accesses State Farm's claim information; correspondence and email is immediately converted into TIF image format when stored in ECS.[98] State Farm follows a published business process to export "claim file" information into a searchable PDF for purposes of litigation.[99] Though State Farm may produce documents in an alternative format in exceptional circumstances, such as producing color-coded highlighting where color conveys meaning or an Excel spreadsheet when the formulas are integral to the issues, they contend that producing the information in an alternative format in this case would impose an "unnecessary burden."[100]

---

[92] *Id.* at ¶ 33.
[93] *Id.* at ¶ 34.
[94] *Id.* at ¶ 37.
[95] *Id.*
[96] Motion for Protective Order at ¶19.
[97] *Id*.
[98] *Id*. at ¶ 20, fn 5.
[99] *Id.* fns 5-6.
[100] *Id.* at fns. 5, 7.

In order to produce the native version of the static image files stored in ECS, State Farm would have to "engineer a new process that includes determining upstream sources of the data, validating the upstream sources, determining whether native files of the information still exists, and developing an extraction method for the native versions."[101] While Defendants are not explicit about what developing this new process would entail, they contend it would require "time, resources, and money"[102] that would be "an extraordinary and burdensome undertaking."[103]

Plaintiffs also request that all documents be produced in color, regardless of an objective purpose or enhanced utility derived from the color.[104] State Farm maintains documents in black and white images since many documents include colored portions that do not have an independent value, like in the logo, so they would have to expend extra efforts and costs to capture and produce all documents in color.[105]

Additionally, Plaintiffs demand that State Farm use Adobe Acrobat to perform redactions,[106] which requires a document by document approach.[107] State Farm contends that the volume of documents which require redactions would either make using Adobe Acrobat incredibly tedious or require "the development and validation of new processes and workflows to perform redactions."[108] In the alternative, State Farm could use an industry standard redaction tool at no extra cost.[109]

---

[101] Motion for Protective Order, Exhibit C at ¶ 26(e).
[102] Motion for Protective Order at ¶ 27.
[103] Motion for Protective Order, Exhibit C at ¶ 26(e).
[104] *Id*. Exhibit B at ¶ 6.
[105] *Id*. Exhibit C at ¶ 30.
[106] *Id*. Exhibit B at ¶ 8.
[107] *Id*. Exhibit C at ¶ 30.
[108] Motion for Protective Order at ¶ 29.
[109] *Id.*

Though Plaintiffs request the claims file information and reports to be exported in delimited file format,[110] State Farm does not have a process in place to satisfy this request, nor is there an alternative procedure that currently exists.[111] ECS is a database intended to be used as an information repository, and there is no functionality to export records in bulk.[112] Ultimately, to comply with Plaintiffs' request, State Farm would have to "create a new procedure, and validate that process, in order to produce information in any manner other than the standard production format."[113]

ii. Analysis

The prevailing requirement is that production of ESI must be in a "reasonably usable" format, but there is much disagreement as to what constitutes a "reasonably usable format." Additionally, since it appears that both parties propose production in different formats that are "reasonably usable," the Court must look to other factors to determine the appropriate production method in this case. The parties produce battling experts, a litany of non-controlling case law, and "best practices" regarding what type of production format is common, acceptable, and necessary.[114] However, the Court is not concerned with what format of production is widely used, condoned by other courts, or representative of the highest standards of practice. This evaluation is case-specific, so while the Court can look to the authorities provided for context and guidance, the Court's decision must ultimately reflect the merits of the situation at hand. The Court is tasked with evaluating the necessity of the information requested by Plaintiffs against the burden on Defendants of producing the information in the requested format. Ultimately, this

---

[110] *Id*. Exhibit B at ¶ 5.
[111] Motion for Protective Order at ¶ 33.
[112] Motion for Protective Order at ¶ 33, fn 12.
[113] Motion for Protective Order at ¶ 33.
[114] *See* Defendants' use of expert Timoth M. Opsitnick and excerpts from The Sedona Conference (Dkt. No. 11, Exhibit C).

means weighing the Plaintiffs' need for metadata – separate from the information produced by Defendants in the claim file – against the onerousness of the tasks it would impose on Defendants.

Defendants present that complying with Plaintiffs' ESI Protocol would require State Farm to re-engineer its processes for retrieving, storing, and producing information for litigation.[115] According to Defendants, "[b]y design, ECS is the most reasonably available source of claim file information in the ordinary course of business. It is the most convenient, least burdensome and least expensive means of producing the information plaintiff [sic] requested." This is because "State Farm does not have or need a business process for tracing information workflows backwards for the purpose of identifying different formats of the same substantive information that have been captured and preserved in ECS." To comply with Plaintiffs' request, Defendants would have to search separate repositories to identify and retrieve different versions of each component of the claim file in ECS, which includes "identifying all such repositories, finding ways to identify and match each item of information in ECS to the same information in other formats in other repositories, and then finding ways to capture, review and produce the duplicative information." Defendants argue that this expense of time and resources is not necessary because the way that State Farm typically produces ESI for the purposes of litigation is "reasonably usable" within the requirements of Rule 34(b). The Court agrees.

The Court does not agree with Plaintiffs that Defendants must present an affidavit or other evidence of the anticipated time and expense that would be incurred if Defendants complied with the request as proof of the burden. Such evidence might aid the Court in weighing the benefit to Plaintiffs against Defendants' burden, but such a showing is not necessary in this case. The information Plaintiffs request from the native format does not fall within the

---

[115] Motion for Protective Order at ¶ 31.

appropriate scope of discovery. While there is ostensibly a benefit to Plaintiffs in knowing the formulas in an Excel sheet or the list of authors on a document, that information is not relevant at all to the issues at hand, even the extra-contractual issues. Therefore, *any* burden incurred by Defendants in producing the information in "native" or "near native" format is too much. According to the Committee Notes to the Rule 34 2006 Amendment, production in a minimally searchable form may be authorized even though more easily searched forms might be available at equal or less cost to the responding party. Plaintiffs can gain all of the necessary information to litigate this issue from the claim file routinely produced from ECS. Though Defendants are not specific regarding the time and cost it would take to comply with the request, neither do they proffer bare generalizations as Plaintiffs contend. The fact that State Farm would have to identify new processes, develop them, and test them is enough to demonstrate a substantial burden.

Accordingly, the Court **GRANTS** Defendants' request to produce ESI in the searchable static image claims files routinely prepared for litigation purposes, which the Court finds is a reasonably usable format consistent with Rule 34(b). Additionally, the Court extends the ruling to preclude production in accordance with Plaintiffs' ESI Protocol that is inconsistent with the Court's findings.

c. *Request for Phased Discovery*

Defendants contend that the vast majority of Plaintiffs' request for discovery is based on the extra-contractual claims, which are all derivative of the breach of contract claim.[116] Therefore, the extra-contractual claims are not relevant unless there was actually a breach of contract. The Texas Supreme Court has affirmed this position by finding that "[w]hen the issue

---

[116] Reply at ¶ 18.

of coverage is resolved in the insurer's favor, extra-contractual claims do not survive."[117] The Fifth Circuit has further found that "there can be no recovery for extra-contractual damages for mishandling claims unless the complained of actions or omissions caused injury independent of those that would have resulted from the wrongful denial of policy benefits."[118] Since these claims – and the discovery requests related to them – may become moot after the resolution of the breach of contract claim, Defendants ask the Court to "exercise its discretion to sequence discovery such that State Farm should not be required to respond to the wide-ranging discovery Plaintiffs seek on the extra-contractual issues."[119]

The problem with Defendants' request is that *if there is in fact a breach of contract*, this case will have to drag on for an unnecessarily long period of time because the Court postponed discovery on the extra-contractual issues. Upon the conclusion of the breach of contract claim, if the claim is in fact valid, the resolution of the case will be greatly expedited if discovery has already been conducted into the other claims, as well. The Court finds that all of the claims are necessarily related such that discovery of all of the claims at once is a much more efficient use of judicial time and resources than a phased discovery process.

## VI. Plaintiffs' Motion to Compel

Because the Court has granted Defendants' requests almost in their entirety, Plaintiffs' motion to compel does not have any further relevance. With one exception, all of Defendants' objections to the request for production have been sustained, precluding disclosure of the requested information, and the Court grants Defendants' request to produce ESI in their proposed format, so the information cannot be demanded in accordance with Plaintiffs' Protocol.

---

[117] *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010); *see also Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 198 (Tex. 1998)(holding that "there is no viable extra-contractual claim without a threshold breach of contract").
[118] *Great Am. Ins. Co. v. AFS/IBEX Fin. Servs. Inc.,* 612 F.3d 800, 808 n.1 (5th Cir. 2010)(internal citation omitted).
[119] Reply at ¶ 18.

However, the Court **GRANTS** Plaintiffs' motion to compel as to the price lists in request for production 9. The Court **ORDERS** Defendants to produce that information as soon as possible. Since there is effectively no additional information to compel, with the exception stated above, Plaintiffs' motion is **DENIED.**

## VII.  Holding

The parties in this case are unnecessarily litigious over matters that could be handled with professionalism and civility. The time and expense counsel wasted filing countless pages of briefs would have been more appropriately spent reaching resolution outside the Court on this matter. "We can ill afford to permit litigants to waste scarce court resources with disingenuous or frivolous arguments and motions asserted purely to hinder and delay the efficient operation of justice."[120] This discovery battle represents an "all-too-common example of the sort of 'Rambo tactics' that have brought disrepute upon attorneys and the legal system."[121] The Court hopes the parties find a more effective way to resolve discovery disputes in the future. The parties are implored to utilize the discovery process for its true purpose, not to fish for new information, harass the other party, or manipulate the case.

For the reasons stated above, the Court finds good cause to grant Defendants a protective order and **GRANTS** the motion with one exception. Defendants' objections to requests for production 10-13, 16, and 18-20 are sustained. Accordingly, Defendants are not required to produce information responsive to those requests as currently written. However, the Court overrules Defendants' objection to request for production 9 and orders Defendants to produce the requested information as soon as possible. Additionally, the Court finds that Defendants requested form of production of electronically stored information is appropriate and "reasonably

---

[120] *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1487 (5th Cir. 1990).
[121] *Id.* at 1486.

usable" given the nature of the information requested. Defendant does not need to produce information in accordance with Plaintiffs' requested format. The Court further **DENIES** Plaintiffs' Plaintiffs' motion to compel, with one exception as to request of production number 9.

IT IS SO ORDERED.

DONE this 15th day of January, 2015, in McAllen, Texas.

_____
Micaela Alvarez
UNITED STATES DISTRICT JUDGE